**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| UNITED STATES OF AMERICA | : | Crim. No. 1:17-CR-0195 |
|---|---|---|
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOSE DOMINGUEZ | : | Judge Jennifer P. Wilson |

## MEMORANDUM

Before the court is a motion to dismiss the indictment filed by Defendant Jose Dominguez ("Dominguez").  (Doc. 159.)  The motion will be denied because the court finds that the indictment sufficiently alleges a conspiracy, the court will not review the Dominican Republic's decision to extradite Dominguez and, even if the court should do so, the extradition was proper under the 2015 Treaty, and extradition of Dominguez under the 2015 Treaty did not violate the *Ex Post Facto* Clause.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On June 28, 2017, Dominguez was indicted with one count of conspiracy to commit an offense against the United States and to defraud the United States in violation of 18 U.S.C. § 371.  (Doc. 1.)  The eighteen-page indictment alleges numerous facts including the following:  Dominguez, a citizen and resident of the Dominican Republic, was the owner of Victor Sinclair Cigars, a cigar manufacturer in the Dominican Republic.  (Doc. 1, ¶ 1.)  ABC Tobacco Importer, a

1

business located in East Stroudsburg, Pennsylvania, imported Victor Sinclair

Cigars from 2009 through 2011.  (*Id.* ¶ 2.)  ABC Distributors, also located in East

Stroudsburg, Pennsylvania, distributed Victor Sinclair Cigars from January 2011

through December 2012.  (*Id.* ¶ 9.)  Hope Carbone ("Carbone") and Donna

Venturini ("Venturini")[1] were co-owners of ABC Tobacco Importer and ABC

Distributors.  (*Id.* ¶¶ 3–4, 10.)

     According to federal law, foreign-manufactured cigars can only be sold in

the United States through a domestic importer.  (*Id.* ¶ 11.)  Domestic importers

must then pay federal excise tax on large cigars imported into the United States.

(*Id.* ¶ 13.)  The excise tax is based on "the first sales price," i.e. "the price for

which the importer sold the cigars in the United States, not the price the importer

paid the foreign manufacturer for the cigar."  (*Id.* ¶ 16.)

     From on or about June 2009 and continuing through on or about December

2012, Dominguez and "others known and unknown" allegedly conspired to evade

and defeat the excise tax imposed on imported large cigars and payment of that tax

in violation of 18 U.S.C. § 371 and 26 U.S.C. § 5762(a)(3).  (*Id.* ¶ 19.)  The alleged

object of the conspiracy was for Dominguez and others to profit from defrauding

---

[1] Carbone and Venturini are identified in the indictment as H.C. and D.V., respectively.  (Doc. 1, ¶¶ 3–4.)  Because they have since been identified in subsequent court filings and their identities are no longer concealed to Dominguez or the public, the court uses their names, rather than initials, here.

the United States of the full amount of the excise tax that should have been paid for the sale of Victor Sinclair Cigars. (*Id.* ¶ 20.) To execute this scheme, it is alleged that Dominguez provided a lower first sale price on invoices than the actual first sale price that United States retailers agreed to pay. (*Id.* ¶¶ 29–30.) Through Victor Sinclair Cigars, Dominguez then purportedly sent accurate invoices that contained the accurate first sale price and excise tax for each cigar shipment to ABC Tobacco Importer. (*Id.* ¶¶ 35–37.) It is alleged that ABC Tobacco Importer then used the accurate first sale price invoices to collect approximately $3.9 million in federal excise taxes from United States retailers, but only paid United States Customs approximately $2.1 million in excise taxes. (*Id.* ¶¶ 39–42.)

In January 2011, Carbone and Venturini purportedly stopped importing Victor Sinclair cigars through ABC Tobacco Importer, but they continued to import the cigars through their company H.S. Importer and distributing cigars through ABC Distributors. (*Id.* ¶¶ 43–44.) In turn, it is alleged that H.S. Importer and ABC Distributors collected federal excise taxes from United States retailers from January 2011 through December 2012, during which only a portion of the collected excise taxes were paid to the United States at the request of Dominguez. (*Id.* ¶¶ 45–47.)

Following the filing of the indictment, the United States requested that the Dominican Republic extradite Dominguez. (*See* Doc. 76.) Dominguez challenged

his extradition, which was litigated in the Dominican Republic.  (*Id.*)  The Dominican Republic's highest court and the President ultimately ordered Dominguez's extradition to the United States.  (Doc. 151-1.)  Dominguez was arraigned before this court on July 13, 2021.  (Docs. 96, 98, 99.)

On December 8, 2021, Dominguez filed a motion to dismiss the indictment as well as a brief in support.  (Docs. 138, 140.)  This motion and brief were refiled on February 9, 2022, to conform with the court's local rules.  (Docs. 158, 159, 160, 165.)[2]  The Government timely opposed the motion on February 10, 2022, and Dominguez filed a reply on February 11, 2022.  (Docs. 151, 166.)  Thus, this motion is ripe for review.

**STANDARD OF REVIEW**

Federal Rule of Criminal Procedure 12(b)(3)(B) permits a defendant to move for dismissal due to a defect in the indictment on various grounds, including the failure to state an offense.  This rule allows district courts to "review the sufficiency of the government's pleadings to ensure that legally deficient charges do not go to a jury."  *United States v. Huet*, 665 F.3d 588, 595 (3d Cir. 2012) (cleaned up), *abrogated on other grounds by Rehaif v. United States*, 139 S. Ct. 2191 (2019).

---

[2] The court references only the refiled motion and brief in this memorandum and accompanying order.

The court must accept the factual allegations in the indictment as true when evaluating a Rule 12 motion. *Huet*, 665 F.3d at 595 (citations omitted). Accordingly, the court's scope of review at this stage is limited as a Rule 12 motion is "not a permissible vehicle for addressing the sufficiency of the government's evidence." *Id.* (quoting *United States v. DeLaurentis*, 230 F.3d 659, 660 (3d Cir. 2000)). "Evidentiary questions—such as credibility determinations and the weighing of proof—should not be determined at this stage." *Id.* (quoting *United States v. Bergrin*, 650 F.3d 257, 265 (3d Cir. 2011)). Thus, in evaluating a motion to dismiss the indictment, a district court must accept the facts set forth in the indictment as true and determine whether a jury could find that the defendant committed the charged offense. *Id.* (citations omitted).

## DISCUSSION

Dominguez argues that the indictment should be dismissed on three separate grounds. First, Dominguez asserts that the indictment fails to state an offense against him. Second, the indictment should be dismissed because the crime for which Dominguez was extradited from the Dominican Republic is not an extraditable offense under the current extradition treaty between the United States and Dominican Republic. And, third, the alleged conduct forming the basis for the charge against Dominguez predates the ratification of the current extradition treaty,

thus, requiring dismissal of the indictment.  The court will address each argument in turn.

### A. The indictment sufficiently alleges a conspiracy in violation of 18 U.S.C. § 371.

Dominguez argues that the indictment only alleges that Carbone and Venturini entered into an agreement with Dominguez to import large cigars from the Dominican Republic into the United States, not that they entered into an *unlawful* agreement to evade excise taxes when importing the cigars.  (Doc. 160, p. 10.)  Further, Dominguez asserts that even had the Government alleged that Carbone and Venturini should have been aware of the unlawful agreement, the indictment still fails to sufficiently state a conspiracy.  (*Id.* at 10–11.)  In support of these arguments, Dominguez avers that the indictment "paint[s] Carbone and Venturini more as victims of Mr. Dominguez's alleged scheme."  (*Id.* at 11–17.)  Dominguez maintains that the Government's own records confirm that Carbone and Venturini were victims as opposed to co-conspirators, and details the contents of several reports from agents involved in the investigation.  (*Id.*)  Dominguez posits that once the Government discovered that prosecuting Dominguez under Title 26 for failing to pay the excise tax was barred, the Government pursued a conspiracy indictment against Carbone, Venturini, and Dominguez.  (*Id.* at 15.)

The Government asserts that the indictment appropriately alleges each element of the offense of conspiracy, the conspiracy's timeframe, and the manner

and means of the conspiracy.  (Doc. 151, pp. 11–12.)  The Government then
identifies three reasons why Dominguez's argument regarding Carbone and
Venturini failing to knowingly enter into an unlawful agreement is flawed.  (*Id.*)
First, the Government argues that a conspiracy indictment does not need to identify
alleged coconspirators; rather, it is sufficient to simply allege that a defendant
conspired with others.  (*Id.* at 12–13.)  Second, assuming the actions and
knowledge of Carbone and Venturini are relevant, the Government submits that
Dominguez's argument amounts to a sufficiency of the evidence issue, which is
inappropriate to address in a Rule 12 motion.  (*Id.* at 13–14.)  Third, the
Government argues that the evidence is sufficient to show that Carbone and
Venturini entered an unlawful agreement with Dominguez.  (*Id.* at 14–15.)
Specifically, Carbone and Venturini pled guilty and admitted they conspired with
Dominguez to defraud the United States in collecting excise taxes during their
respective change of plea hearings.  (*Id.*)

In reply, Dominguez asserts that his argument is "that the Government failed
to adequately allege that Defendant conspired with anyone to commit an unlawful
act, not that the Government has not identified his co-conspirators or included
enough detail about what 'Carbone and Venturini may have done or know.'"
(Doc. 166, p. 20.)  Dominguez submits that he is not making a sufficiency of the
evidence challenge; instead, he is arguing that the indictment fails to allege the

"necessary factual piece that could arguably make out a conspiracy charge: that Defendant entered into an ***unlawful*** agreement with Carbone and Venturini (or anyone else) to evade excise taxes." (*Id.* at 21–22.)

Federal Rule of Criminal Procedure 7(c)(1) details the required information that must be included in an indictment. An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." FED. R. CRIM. PRO. 7(c)(1). "It is well-established that an indictment returned by a legally constituted and unbiased grand jury, if valid on its face, is enough to call for trial of the charge on the merits." *Huet*, 665 F.3d at 594–95 (cleaned up). An indictment is facially sufficient if it "(1) contains the elements of the offense intended to be charged, (2) sufficiently appraises the defendant of what he must be prepared to meet, and (3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution." *Id.* (quoting *United States v. Vitillo*, 490 F.3d 314, 320 (3d Cir. 2007)). As long as the indictment contains "sufficient factual orientation" so that a defendant can prepare his defense and invoke double jeopardy, nothing more than the statutory language is required. *Id.* (quoting *United States v. Kemp*, 500 F.3d 257, 280 (3d Cir. 2007)). "Generally, an indictment will satisfy these requirements where it informs the defendant of the statute he is charged with violating, lists the elements of a violation under the statute, and specifies the time

period during which the violations occurred." *Id.* (citing *United States v. Urban*, 404 F.3d 754, 771 (3d Cir. 2005)).  However, an indictment fails to state an offense when it fails to charge an essential element of the crime.  *Id.* (citing *United States v. Wander*, 601 F.2d 1251, 1259 (3d Cir. 1979)).

The indictment in this case charges Dominguez with one count of conspiracy to commit an offense against the United States and to defraud the United States in violation of 18 U.S.C. § 371.  The Third Circuit requires four elements in this type of conspiracy: (1) two or more persons agreed to commit an offense against or defraud the United States; (2) the defendant was a party to the agreement; (3) the defendant joined the agreement or conspiracy knowing of its objective to commit an offense against or defraud the United States and intending to join together with at least one other alleged conspirator to achieve that objective; and (4) during the conspiracy, at lease one member of the conspiracy performed an overt act to further the objectives of the agreement.  Third Cir. Model Instructions 6.18.371A & 6.18.371B.  "Defraud the United States" is defined as "cheat the United States government or any of its agencies out of money or property."  Third Cir. Model Instructions 6.18.371B.

A review of the indictment satisfies the court that the Government has sufficiently alleged all the required elements to survive a Rule 12 motion.  First, the indictment alleges that Dominguez, Carbone, and Venturini agreed to pay the

United States less excise tax than was required by using different first sale prices, i.e. defrauding or cheating the United States out of money.  (*See* Doc. 1, ¶¶ 19, 21, 27–42.)  Second, the indictment alleges that Dominguez was a party to this agreement and initiated this agreement with Carbone, Venturini, and unnamed others.  (*See id.*)  Third, the indictment sufficiently sets forth facts to lead to the conclusion that Dominguez joined the agreement with the specific objective to evade paying the full amount of excise tax and worked with more than one other individual to accomplish this objective.  (*See id.* ¶¶ 20–80.)  Lastly, the indictment alleges multiple overt acts completed by Dominguez and others in furtherance of the conspiracy, including sending fraudulent invoices for the first sale prices to customs brokers and shipping large cigars to retail customers from the Dominican Republic.  (*See id.* ¶¶ 48–80.)

While Dominguez asserts that Carbone and Venturini are portrayed more like victims and there are no facts in the indictment alleging an unlawful agreement between the three, the court finds otherwise.  The indictment alleges specific facts regarding how Dominguez, Carbone, and Venturini worked together to avoid paying the full amount of excise tax, which, if proven, is an offense against the United States that defrauded the United States of the full amount of excise tax. The issues that Dominguez raises in this section of his motion are more properly

asserted as challenges to the sufficiency of the evidence.  Accordingly, the motion will be denied in this regard.

### B. The court will not dismiss the indictment on the basis that Dominguez was not charged with an extraditable offense.

Next, Dominguez argues that the current extradition treaty between the United States and Dominican Republic ("the 2015 Treaty")[3] permits extradition only if there is an analogous crime in the Dominican Republic that he could have been charged with that is punishable by the "deprivation of liberty" of more than one year.  (Doc. 160, pp. 18–19.)  He asserts that there is no such analogous crime because Dominguez operated in a tax-free zone in the Dominican Republic, and, even if he was liable for excise taxes, the penalty in the Dominican Republic's tax code does not include the deprivation of liberty for more than one year.  (*Id.* at 19–22.)  Thus, the doctrine of "dual criminality" has not been met in this case.  (*Id.* at 18–23.)  Dominguez submits that the Supreme Court of Justice of the Dominican Republic, the highest court in the Dominican Republic and the court that reviewed the extradition request, did not directly address these issues because his lawyers did not raise these arguments before that court.  (*Id.* at 22–23.)  That aside, Dominguez believes that this court would still be required to review the Dominican Republic's determination.  (*Id.* at 22.)  In sum, Dominguez pleads that the

---

[3] The parties do not dispute that the 2015 Treaty was the applicable treaty for the United States and Dominic Republic to reply upon for this extradition request.

indictment should be dismissed because the requirements of the 2015 Treaty have not been met, and thus, Dominguez's extradition to the United States was improper.  (*Id.* at 18–23.)

In turn, the Government argues that Dominguez cannot challenge the Dominican Republic's extradition decision in this court.  (Doc. 151, pp. 16–22.) The United States' request to extradite Dominguez pursuant to the 2015 Treaty was before the Supreme Court of Justice, which held that Dominguez should be extradited based on the indictment in this case.  (*Id.* at 18; Doc. 151-1, pp. 1–2.) The President of the Dominican Republic then ordered Dominguez's extradition based on the Supreme Court of Justice's determination.  (Doc. 151-1.)  The President's order cited the 2015 Treaty and stated that "the facts that gave rise to the extradition request had the character of a crime, in accordance with the legislation of both parties."  (*Id.* at 4.)  Ultimately, the Government submits that precedent does not permit a federal court to review another country's decision to extradite its citizen.  (Doc. 151, pp. 16–22.)  Alternatively, the Government asserts that if it were appropriate to evaluate the Dominican Republic's extradition decision, the dual criminality requirement would be met here.  (*Id.* at 22, n.8.)

The Third Circuit has previously addressed whether courts in the United States should review the extraditable nature of the indicted offense after the extraditing country made a determination to authorize the extradition.  Specifically,

the Third Circuit determined that courts are precluded from reviewing the decision from a foreign country's court as to the extraditable nature of the offense.  *McGann v. U.S. Bd. of Parole*, 488 F.2d 39, 40 (3d Cir. 1973) (per curiam).  "[A]ny inquiry into whether or not a crime is extraditable per the terms of an extradition treaty should be directed to the surrendering state, not the requesting state."  *Reyes-Vasquez v. Scism*, 514 Fed. App'x 133, 136–137 (3d Cir. 2013) (per curiam) (citations omitted) (holding that "the Dominican Republic considered the extradition request and chose to grant it.  Whether the extradition was based on extraditable crimes specifically enumerated in the Extradition Treaty is not a question for this Court, but should instead be directed to the Dominican Republic.").

Applying this precedent, the court is not permitted to review or question the Dominican Republic's determination to extradite Dominguez.  The Dominican Republic's highest court reviewed the extradition request from the United States for Dominguez, and agreed that the request complied with the 2015 Treaty.  (*See* Doc. 151-1.)  The President of the Dominican Republic then reviewed the request and entered an order extraditing Dominguez to the United States to face the indictment in this case.  (*See id.*)

Dominguez heavily relies on *United States v. Khan*, 993 F.2d 1368 (9th Cir. 1993), in support of his argument that this court should review and find that the

"dual criminality" requirement of the 2015 Treaty has not been satisfied. *Khan*, 993 F.2d at 1373 (holding that the court was "not convinced that Khan could be charged and punished in Pakistan for the conduct underlying Count VIII, separate and apart from the crime of conspiracy. Therefore, the doctrine of dual criminality [was] not satisfied with respect to Count VIII."). However, this Ninth Circuit persuasive decision is contradicted by Third Circuit precedent requiring courts in the United States to refrain from reviewing the extraditing country's analysis. Furthermore, the Ninth Circuit does not appear to address the specific question of whether a court within the United States should review the extraditable nature of an offense from another country.

Dominguez also cites to a variety of other decisions in support of his position that this court should review the Dominican Republic's extradition determination. However, the case law is inapposite. *See Quinn v. Robinson*, 783 F.2d 776 (9th Cir. 1986) (reviewing whether an individual in the United States should be extradited to the United Kingdom); *United States v. Riviere*, 924 F.2d 1289 (3d Cir. 1991) (rejecting defendant's dual criminality argument because the court "could conceive of no good reason why, if an asylum country extradites a requested person for a criminal act in the requesting state and voluntarily waives any limits on his prosecution, he cannot be prosecuted when returned to the requesting state regardless of the law of the asylum country"); *United States v.*

*Garcia*, 37 F.3d 1359 (9th Cir. 1994) (noting that defendant was extradited on only 6 of the 26 crimes because 20 of the offenses were not crimes in the extraditing country).

In addition to the inapposite decisions cited by Dominguez, he also cites one Third Circuit opinion in his reply brief that requires further discussion. In *United States v. Thomas*, 322 Fed. App'x 177, 180 (3d Cir. 2009), the court held that the defendant had standing to raise a dual criminality argument in the United States after the United Kingdom made a determination to extradite the defendant. The Third Circuit's unpublished 2009 decision in *Thomas* appears to be in tension with the Court's 2013 unpublished decision in *Scism*, that is referenced previously. The *Scism* decision does not address the earlier decision in *Thomas*, and it is not apparent based on the discussion in each decision that one is more applicable to this case than the other. Accordingly, in an abundance of caution, the court will address Dominguez's dual criminality argument.

The rule of dual criminality requires an extraditable offense to be punishable under the criminal laws of both the surrendering and requesting states. *Id.* (citing *United States v. Saccoccia*, 58 F.3d 754, 766 (1st Cir. 1995)). This concept is embodied in Article 2 of the 2015 Treaty. Article 2 provides as follows:

> 1.      An offense shall be an extraditable offense if, under the laws of both Parties, the maximum applicable penalty is deprivation of liberty for more than one year or more severe penalty.

(Doc. 160-1, pp. 18.)  However, Article 2 also provides:

> 3.    For purposes of this Article, an offense shall be an extraditable offense:
>
>> (c) for offenses involving fraud or evasion of obligations with respect to taxes, customs duties, or controls on the import or export of commodities or currency, whether or not the laws of the Requesting and Requested Parties provide for the same sort of taxes or duties or for controls on the same sorts of commodities or on the same amounts of currency.

(*Id.* at 18–19.)  The underlying crime to the conspiracy in this case involves evading the obligation to pay the United States excise tax on large cigars to at least some extent.  *See* 26 U.S.C. § 5762(a)(3).  Dominguez's argument that he is in a "tax free zone" and, even if liable for any taxes, would not be punished with the deprivation of his liberty, is beside the point.[4]  That is because Article 2, Section 3 provides that violating 26 U.S.C. § 5762(a)(3) would still be an extraditable offense.  As a result, the court will not dismiss the indictment on the ground that the offense charged is not an extraditable offense.

### C. The extradition of Dominguez under the 2015 Treaty did not violate the *Ex Post Facto* Clause.

L astly, Dominguez argues that without the 2015 Treaty, he could not have been extradited or prosecuted for the charged offense.  (Doc. 160, pp. 23–30.)  In

---

[4] The argument is also contradicted by the extradition order entered by President Luis Abinader of The Dominican Republic based on the Supreme Court of Justice's determination, in which the President recognized the requirement that "on the date of their commission the facts that gave rise to the extradition request had the character of a crime, in accordance with the legislation of both parties."  (Doc. 151-1, p. 4.)

1909, the United States and the Dominican Republic entered into an extradition treaty ("the 1909 Treaty"). (*Id.* at 24.) The 1909 Treaty was the operative treaty during the time period covered in the indictment. (*Id.*) Based on this, Dominguez asserts that the 1909 Treaty would not have permitted Dominguez to be extradited because there was no analogous crime in either country at the time the 1909 Treaty was agreed upon. (*Id.*) Because the 2015 Treaty was used to extradite Dominguez for crimes committed prior to 2015, the United States violated Article 1, Section 9, of the United States Constitution, i.e. the *Ex Post Facto* Clause, requiring dismissal of the indictment. (*Id.*)

In support of this argument, Dominguez relies upon the Fourth Circuit case of *Plaster v. United States*, 720 F.2d 340 (4th Cir. 1983), because of the "instructive" principles from the case. (Doc. 160, pp. 24–26.) Dominguez argues that, similar to *Plaster*, his rights are "being violated by his continued incarceration and prosecution through the operation of an *ex post facto* application of a United States treaty." (*Id.* at 27.) According to Dominguez, the retroactive application of Article 20 of the 2015 Treaty creates "the constitutional impasse by authorizing extradition and prosecution for crimes committed in the United States in 2009-2012 which by definition were not criminal under the 1909 Treaty." (*Id.*) Dominguez points the court to two additional Supreme Court cases, specifically,

*Reid v. Covert*, 354 U.S. 1 (1957), and *Bond v. United States*, 572 U.S. 844 (2014), in support of his constitutional argument.  (Doc. 160, pp. 28–30; Doc. 166, pp. 17.)

The Government argues that the E*x Post Facto* Clause prohibits laws that "retroactively alter the definition of crimes or increase the punishment for criminal acts," which the 2015 Treaty did not do.  (Doc. 151, pp. 22–23 (quoting *Collins v. Youngblood*, 497 U.S. 37, 42–43 (1990)).)  18 U.S.C. § 371, the indicted crime, was a crime when Dominguez committed the offense charged and the penalties have not changed.  (*Id.* at 23.) Further, the Government asserts that it is irrelevant whether Dominguez could have been extradited prior to the ratification of the 2015 Treaty because extradition proceedings are not criminal in nature, thus, the *Ex Post Facto* Clause is not relevant to the analysis.  (*Id.* 23–24.)  Lastly, the Government submits that the cases cited by Dominguez merely stand for the general (and undisputed) proposition that a treaty cannot supersede the Constitution, not "whether extradition pursuant to a treaty that was ratified after commission of the charged conduct in fact violates the Constitution."  (*Id.* at 24.)

As a general matter, *ex post facto* considerations prohibit the United States from enacting any law "which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed."  *Weaver v. Graham*, 450 U.S. 24, 28 (1981) (collecting Supreme Court cases for this proposition).  While the Third Circuit has not addressed the

18

issue of whether the *Ex Post Facto* Clause impacts extradition treaties, other courts have and the court will rely on these persuasive authorities.

A change to an extradition treaty "in no way criminalize[s] an action that was legal when it was committed." *United States v. Ramnath*, 533 F. Supp. 2d 662, 672 (E.D. Tex. 2008) (citing *Weaver*, 450 U.S. at 28; *In re Extradition of McMullen*, 769 F. Supp. 1278, 1291–92 (S.D.N.Y. 1991), *aff'd*, 953 F.2d 761 (2d Cir. 1992)). When reviewing whether an individual is subject to extradition, courts look to "the law in place at the time the extradition request was made, not the law in effect when [the individual] allegedly committed the offenses." *Nezirovic v. Holt*, 779 F.3d 233, 238 (4th Cir. 2015); *see also Oppenheim*, 16 F.2d at 956 ("Extradition proceedings are not in their nature criminal, even if the [individual] is a criminal; extradition is not punishment for crime, though such punishment may follow extradition; therefore all talk of ex post facto legislation . . . is quite beside the mark.").

Thus, the 2015 Treaty may be applied retroactively to render an individual extraditable for earlier conduct with violating the *Ex Post Facto* Clause. *See Nezirovic*, 779 F.3d at 238 (citations omitted); *Garcia-Godos v. Warden*, 853 Fed. App'x 404, 409 (11th Cir. 2021) (finding the *Ex Post Facto* Clause argument without merit because the extradition "did not retroactively alter the definition of

19

his narcotics offenses or increase the punishment for these offenses."). This is

consistent with the language of Article 20 of the 2015 Treaty which provides:

> The process of extradition provided for by this Treaty shall apply to
> requests submitted after its entry into force even if the offenses for
> which extradition is requested were committed before the Treaty's
> entry into force, provided that the conduct on which the extradition
> request is based constituted an offense under the laws of both Parties at
> the time the conduct occurred.

(Doc. 161-1, p. 26) (emphasis added.) Furthermore, the *Ex Post Facto* Clause is

inapplicable to international treaties or criminal laws in other countries. *Ramnath*,

533 F. Supp. 2d at 672–73 (citing *Neely v. Henkel*, 180 U.S. 109, 122–23 (1901);

*United States ex rel. Oppenheim v. Hecht*, 16 F.2d 955, 955 (2nd Cir. 1927)).

The court is not convinced by the holdings of *Reid*, *Plaster*, or *Bond*, relied

on by Dominguez, that dismissal of the indictment is warranted. As noted by the

Government, these cases discuss the limits on treaties superseding the Constitution,

not whether an extradition treaty can attach to actions prior to the ratification of

such treaty. Rather, the court is persuaded by the district and circuit court

decisions specifically finding that an extradition treaty does not implicate the *Ex

Post Facto* Clause of the Constitution. On the basis of those authorities, the court

concludes that the 2015 Treaty may be applied retroactively to render Dominguez

extraditable for his earlier conduct. Therefore, the court declines to dismiss the

indictment on this ground.

## CONCLUSION

For the reasons stated herein, the court will deny Dominguez's motion to dismiss the indictment.  An appropriate order will issue.


                                        s/Jennifer P. Wilson
                                        JENNIFER P. WILSON
                                        United States District Court Judge
                                        Middle District of Pennsylvania

Dated: May 20, 2022